$534.72 in favor of bills issued by a chiropractor by the name of Delilah Anderson. Now, our reasons is this. Dr. Anderson, as a chiropractor, was treating Ms. Striddi, the claimant, for thoracic outlet syndrome. So what is thoracic outlet syndrome? There's a bundle of arteries from the chest and nerves from the neck that pass above the first rib and under the arm. It's basically in the armpit area. That's the thoracic outlet where the blood vessels and nerves exit from the chest and enter the underside of the arm. They innervate the underside of the arm especially, pass through the ulnar side of the forearm and the little and ring finger. Now, according to Dr. Ghanayam, which is our expert on this case, Dr. Ghanayam testified that this lady, based on his examination of her, never had thoracic outlet syndrome. Dr. Ghanayam relied principally on the Adson maneuver. The Adson maneuver is when the patient puts the hand in the extended, well, 90 degrees, the forearm, excuse me, the upper arm is 90 degrees from the body and the forearm extended 90 degrees, like you're holding up your hand as a student in school. And then you turn the head the opposite way from the hand. And if you have a thoracic outlet syndrome, that will tend to compress the passage where the nerves and the blood vessels are exiting the chest and entering the arm. And the doctor can feel that by taking the person's pulse while they're doing it. And they do it for a minute or so and the doctor determines is the pulse obliterated by the maneuver or is the pulse diminished by the maneuver. That would be a positive test and that would show that the person does indeed have thoracic outlet syndrome. So nobody else did this test? Nobody else did it. Dr. Pierce, the doctor on whom Ms. Strudy relies, did a test where the person raises their hand in the same fashion, but the doctor doesn't take the pulse. He just asks, does this increase your pain? The doctors testified differently as to the value of those tests, right? They did. And Dr. Pierce said my way of doing it is the best way. Dr. Ganium said my way of doing it is the best way. The commission had competing medical testimony and they chose, right? Well, I disagree with Your Honor respectfully. First of all, as to the ease test, the reason why it's not useful in this case is that if the person has something wrong with their shoulder itself, like a torn labrum or a partially torn rotator cuff, they will have symptoms when they do this. They will not have their pulse diminished, but they will have increased discomfort. Now, this lady, she did turn out to have surgery by Dr. Richard Erickson on August 9, 2010, and Erickson found that she did have a partially torn labrum, the superior aspect of the shoulder, and she did have a partial rotator cuff tear. That's what he fixed, and those particular conditions will cause her to have symptoms when she does the ease test because the doctor is just asking her, does this make your pain worse? He's not actually feeling the pulse in the ease test. Let me see if I have this straight. Pierce, the commission resolved the conflicting medical evidence in favor of Pierce. The commission found that Pierce's opinion was supported by Dr. Erickson and Dr. Morrow. You're pointing out and arguing to us why Ganium's tests and opinion are superior, but do we substitute our judgment on conflicting medical evidence for the commission? How would we ever go with Ganium versus the commission's finding of Pierce, Erickson, and Morrow? How do we do that? Okay, so answering that question is that the commission basically, the arbitrator thought that there was several reasons for her decision. Number one, she thought that Pierce testified that there was a difference between thoracic and neurological thoracic outlet syndrome. Excuse me, I said that wrong. She, meaning the arbitrator, said that there was some sort of difference between vascular, which means compression of the blood vessels, and neurologic, which is compression of the nerves through the thoracic outlet. She thought there was a difference and the doctors were making a distinction. That was wrong. The commission recognized that that was wrong, and they vacated the reasoning by the arbitrator, but they just affirmed her decision for no reason. I guess to ask the pointed question, this is an unusual question, what would you suggest our decision read in your favor? We start out with the well-settled principles. It was within the province of the commission to resolve conflicting medical evidence and the weights to be given to the evidence, and we must decide if there's some evidence in the record to support the commission's decision, which obviously, indisputably, there is, depending on your perspective. So we then say we believe that Ghanayim's medical opinion is superior to that of the other doctors. How do we do that? On what legal basis do we do that? I think you would put it against the manifest weight standard, but you would note, Your Honors, that the commission undercut, undermined, vacated the arbitrator's reasoning for why she preferred Dr. Pierce's opinion over Dr. Ghanayim's, but the commission failed to substitute any reasoning of its own why they adopted Dr. Pierce's. Did you file a petition for a finding, which you could have done? A specific finding? Well, the commission did give us a decision. Did you give a specific finding as to why they adopted Pierce over Ghanayim? You could have done that, couldn't you? Well, I guess I could have, but, you know, Erickson said that there's possible thoracic outlet syndrome. Anderson agreed with the diagnosis, and Mara says that he wouldn't exclude the possibility of thoracic outlet syndrome either. Seems like the only one that's absolutely saying she doesn't have thoracic outlet syndrome is Ghanayim. Okay. Well, go one by one. Erickson is an orthopedic. His specific role is the treatment of the shoulder itself. He was the one that eventually did the surgery to repair the partially torn labrum and partially torn rotator cuff. He did not specifically say she has a thoracic outlet. He wanted to have a consult to figure out whether there was thoracic outlet syndrome. Mara is in the same category of doctors that are specifically orthopedic doctors to the shoulder, and that was his point that he examined her for specifically. What did Anderson say? Anderson, the chiropractor. Well, she tries to justify this thoracic outlet syndrome, but she's just a chiropractor. She's not on the same plane as these other doctors. But wait a minute. Hold on a second. Erickson said he diagnoses with possible thoracic outlet syndrome, and on November of 2009, he's the one that recommends that the claim be seen by Anderson because evidently Anderson has some expertise in thoracic outlet syndrome. Right. Well, we found out that she really didn't have any because, you know, we being Aldi paid for the first 86 visits to her, and there was no progress. In fact, there was a decline in her abilities by 86 visits. Look, if we take everything you're arguing, the only thing you're arguing to us is the commission should have accepted Ghanayim as opposed to Pierce. There's a million reasons in here why the commission could do what it did. This is manifest way. There's no actual right answer in manifest way. It can go either way, and they chose Pierce. And there's evidence in the record to support their decision. I think that certainly if there's evidence, it's a mere scintilla, and I think that Ghanayim really had the best evidence, the most persuasive evidence. The manifest way to the evidence is that Ghanayim was right on this. Additionally, to the Adson's test, there's also the fact that the pain drawing that Ms. Striddy filled out showed not the conditions that would be similar to those of a thoracic outlet syndrome sufferer. Dr. Pierce relied on the scalene block. Dr. Ghanayim explained that the scalene block will be relieving of the person's pain if the person has a primary shoulder problem, which the petitioner claimant, Ms. Striddy, turned out to actually have. So there is no specific test that really supports the idea that this lady had thoracic outlet syndrome and did not have a shoulder problem primarily. In fact, the arthroscopic surgery showed that she did have a torn labrum and partially torn rotator cuff. That's accepted. That's paid for. That's not contested. So, no, I don't think that the commission adopted a reasonable interpretation. They adopted the arbitrator's decision, but they undercut her reasoning and didn't supply anything else. Also, Dr. Pierce, if you accepted him, he was saying that the petitioner or claimant, Ms. Striddy, needed to have physical therapy for the thoracic outlet syndrome. Now, physical therapy for the thoracic outlet would try to improve the person's posture so that they would not have a sagging shoulder that would tend to compress the thoracic outlet. And Anderson is not a physical therapist. If you thought that she needed a physical therapist to help her recover from the shoulder surgery she had, yes, she probably did. Erickson ordered that. But Dr. Anderson is not a physical therapist. So the commission is ordering us to pay for physical therapy services by somebody who is not a physical therapist. Well, didn't Dr. Pierce refer Anderson to a physical therapist, Eden or Iden, E-I-D-E-N, who then set up a plan for Anderson to follow? Well, he did say that Teresa Iden would be a useful physical therapist to treat this problem, but he, meaning Pierce, said he didn't know what Anderson's credentials were. He thought she was either a physiatrist or a physical therapist. Well, he said that in his deposition, but he obviously knew she was a chiropractor because that's what he said in his office notes. I mean, on August 12, 2010, in his office notes, he wrote that the claimant was also seeing a chiropractor, Dr. Anderson, who was helping her with her symptoms. So he knew at that point. Are you saying that as a matter of law, Anderson is not qualified to perform physical therapy? Yes, sir. That's what we argued in the brief. That's what I'm arguing now. Yes. What's your best case that suggests a chiropractor has no right by virtue of their license to perform physical therapy? You got a case that says that? Well, I have a Florida case. Yes, I cited a Florida case in the brief. I couldn't find an Illinois case on point, but in Florida they have that under Weldon v. All-American Life Insurance, 605 Southern 2nd 911. Why? What's the logic to that? What's the logic to it? Well, physical therapists are trained according to the statute that, the statute in our state that defines physical therapists and what one has to do, 225 ILCS 60-2, one has to complete a course of study and pass an examination. What does a physical therapist do? What do they do? What do they do? They guide persons in exercises and they perform massages. They perform hot and cold packs, for example. And those are the modalities I'm most familiar with. Do they manipulate your spine and portions of your spine? Well, that's the point, that this is not a case about the spine. Do they do that? Can they do that? Do they do that? Under certain circumstances, they may perform massages to the spine area, yes. I don't think they do exactly the same type of maneuvers that chiropractors try to do to align the spine. It's not really the same, no. Well, it seemed to me that under the Medical Practice Act of 1987 defines a chiropractic physician as a person licensed to treat human ailments without the use of drugs, without operative surgery, claim and testify Anderson's treatment included electro-stimulation, ultrasounds, adjustments. So unless you have a case in Illinois, I suggest you have a high hurdle to convince us that Anderson does not qualify as some type of a physical therapist, notwithstanding the Florida case. My point is that she's not licensed to practice physical therapy in Illinois, and if your justification for awarding the bills is that Pierce or Erickson ordered physical therapy, and they both did, then this particular person being a chiropractor is not licensed to perform physical therapy. But you say she's not licensed. Chiropractors treat through manipulation of portions of the body. Now, what's a massage if not a manipulation of a portion of your body? It's a manipulation of your muscles, not your spine. Yes. So that is a difference. Yeah, chiropractors could do massages under the definition. You're right. I'm not arguing that. Counsel, you'll have time and reply. You may proceed. Good morning, Your Honors. Counsel, I'm Frank Kress on behalf of Christy Striddy, the petitioner, and the ally in this matter. Counsel gave you a very nice recitation of the facts of this case, including what thoracic outlet syndrome is and tests are for that. And so you don't need to do that now, do you? Excuse me? You don't need to do that now, do you? I'm not going to do that now. But what I'm going to say is he talked about facts. Facts, facts, facts. And we have a dispute of the facts. Which doctor to believe, is it Pierce or Gania? Is Dr. Anderson, chiropractic Dr. Anderson, fit to do physical therapy? Were her bills reasonable and necessary? And the commission found that Dr. Pierce was, his opinion was to be adopted over that of Dr. Gania. The commission found that PT, rendered by Dr. Anderson, was reasonable and necessary and awarded the bills accordingly. And as we know, where evidence is conflicted or of such nature that different inferences can be drawn, it is for the commission to make those decisions. I currently have a wife at home who is seven months pregnant, and I understand exactly what it's like to defer to someone else for determination of where preponderance lies on all issues in my home. So that's kind of like where the commission is on this. Arbitrator Kinnaman indicated that it was a close call. Which doctor's opinion to adopt? And she seemingly struggled with that. Is it surprising to you that Arbitrator Kinnaman adopted the position favorable to the Petitioner? Arbitrator Kinnaman had a reputation for being somewhat Petitioner-oriented. Somewhat? That's pretty admirable. Go ahead. I had spoken with multiple Respondent's attorneys in the last years of her tenure that said she was somewhat more middle of the road toward the end. Nevertheless, this case is not going to turn in our opinions of where she stands. Of course not. Of course not. But the commission, in a 2-0 decision, affirmed her reasoning. And the changes that were made to the award, I believe, amount to clerical corrections, what type of thoracic outlet syndrome. What about his argument, though, that the commission didn't reject the arbitrator's reasoning, but then they found the other side and they didn't specify any reasons or findings why? I think that the commission How do you respond to that? Shouldn't they have done something? Perhaps they should have. But again, I read the decision to say that the arbitrator found that the Petitioner had sustained a certain type of thoracic outlet syndrome. And that wasn't necessarily in the medical evidence. And that she was diagnosed with thoracic outlet syndrome generally. And that's what the commission decided, on a matter of fact, in reviewing the competing medical evidence. And if I were a Respondent's attorney, I might not have liked the way they decided. But they, again, are the ultimate arbiter of those facts in determining which medical evidence wins the day. And they found in favor of the claimant in this way. Again, Dr. Anderson, I almost want to say, was handpicked by experts in this matter to perform the physical therapy. She went to doctor's appointments. She met with Teresa Iden to learn what type of physical therapy to do for this condition. I think that the commission put a lot of weight behind that in determining that the treatment that she did Setting aside the referral, he's making the argument under this Florida case and other case licenses. Look, that's all well and good, but legally she is not qualified to be a physical therapist. She's a chiropractor. What do you make of that argument? I don't believe that that argument carries a lot of weight. Why not? I agree with what Justice Hoffman was indicating. The modalities of treatment are almost identical between what you're going to get at a In fact, the circuit court judge who heard our arguments kind of indicated the same thing when we were talking that day. Maybe there's a stigma with chiropractors versus physical therapy, but it's essentially the same modalities. The question isn't whether Anderson was qualified to be a physical therapist. The question is, is whether she is licensed or her license permits her to perform physical therapy. No one is suggesting she's a licensed physical therapist. She never claimed to be. But can a chiropractor, under the guise of their license, as part of their treatment, perform physical therapy? That's really the question. Sure. And if we were in Florida, perhaps there would be some legal basis for saying that they could not. But I believe that a chiropractor can render that treatment as a physical therapist. They are licensed by the State to practice this type of treatment. Again, I'll reiterate that these are all issues of fact that were decided by the commission and there is a wealth of medical documentation to support the claimant's position on this, that thoracic islet syndrome is related to her work activities. And I would ask that this matter be affirmed in its entirety, as there's nothing against the manifest way of evidence in this matter. Well, isn't the argument whether she has this syndrome or not? I mean, is that the simple issue? I think it is. It is. And we've got Dr. Marra, Dr. Pierce, Dr. Erickson, suggesting that she does, and Dr. Ghanayam. Well, does anybody refute Dr. Ghanayam's statement that his test has 7% false positive and, I mean, the Adsen's maneuver test and the S test has 16%? 9% difference. Dr. Pierce definitely indicates that he believes that the scalene block is the best way of determining whether someone has the condition. Maybe he's wrong. Maybe he's wrong. And maybe Dr. Ghanayam is right. But that decision was made by the commission, so we shouldn't be disturbing it now. So if they said the earth is flat, we shouldn't disrupt that? If we follow the rules that we've got and we know what the manifest way of evidence standard is and an administrative agency out there says that the world is flat, perhaps we ought to. But I think there would be evidence to contradict that. Isn't it? I'm sorry. Thank you very much. I follow a church dog. Yes. Mr. Newman, you may reply. Well, getting to the gist of the arbitrators and the commission decision, especially the commission, the commission corrected the arbitrator by saying that Dr. Pierce used a more generic diagnosis of TOS as a label. And then the commission further found that the arbitrator erroneously indicated after Ghanayam testified, Pierce clarified his diagnosis and there was no contrary opinion. A review of the record indicates the reverse occurred and that Dr. Ghanayam actually provided testimony and offered a contrary opinion to Dr. Pierce after Dr. Pierce had testified. So the commission, yeah, they are right about that, but they're just indicating there was conflicting medical evidence on the point. And then they didn't go a step further and say we believe in Pierce because of this or we believe in Ghanayam because of that. However, they affirmed and adopted. They just affirmed for no reason. They otherwise affirmed and adopted the decision of the arbitrator. So they end up affirming for no reason. That's why I say that I can argue that they're against the manifest way of the evidence. They failed to produce a reason. Dr. Ghanayam is the far more persuasive doctor because he did a much more thorough examination, much more careful examination. He, you know, relied on the Adson test. I went over that, the EMG test. She did have a positive one, but then it turned negative for the TOS. The scalene block that Frank referred to, the scalene block would relieve the pain if she had a torn labrum or partially torn rotator cuff, which she turned out to have. So the scalene test does not prove that she had thoracic outlet syndrome at all. It's not diagnostic whatsoever in this particular case. As to the chiropractor versus the physical therapist issue, physical therapists guide you in exercise. That's what they do and that's what a thoracic outlet syndrome person would need if she were one. Ghanayam was specific. She doesn't need to be treated for thoracic outlet. She never had that problem. But if she did and she needed a physical therapist to treat her, the physical therapist would train her in exercises to keep her in a good posture so the thoracic outlet is not compressed by a sagging shoulder. Well, Christy didn't really have that problem either because she had good posture. That's throughout everybody that noted that. But if she did, she would need an exercise therapist. An exercise therapist would be a physical therapist. The overlap, if any, between physical therapists and chiropractors is in the activities where the patient is passive and the chiropractor is doing something to him or her, like a massage or electrical stim. If it's an exercise she needs, the physical therapist is the one that does it. The other point is that I think that this lady, Ms. Anderson, she just tried to prolong this lady's disability, not cure it. I think the proof in that was at page 274 of your record where Erickson pointed out that the exercises that Anderson was having this lady do were precisely wrong. He was having her extend the arm, hold a weight, and rotate. If you want somebody's labrum to hurt, that's what you do. That's a replication of the O'Brien test, which doctors do with no weight, to see if they can identify where the labrum's torn because that's where the person will have the pain. So Anderson's behavior is totally wrong in this case. If she wants to make this lady keep hurting, she should keep doing what she's doing. And that's why she should not do it. That's why we want to cure this lady. We don't want her to go on to a perpetual state of needing to see Dr. Anderson day after day. We paid for 86 visits. That was too much. We were right to cut her off on June 30, 2010. And I just ask you to please affirm that decision and reverse the commission decision. Thank you very much. Thank you. I also have a message from the guys who have the second case, the Sachs case. They say they settled, and they'll send in a motion. Maybe that came to settle this. That has all been dealt with. Okay. Yeah, they called me yesterday and wanted me to make sure that you all know that so that you can go on to the next. Yeah, they were looking for someone. Thanks. Thank you. Thank you for bringing that to us for attention. Thank you, counsel. Do you think Commissioner Piggott became more middle-of-the-road with the appearance of Commissioner Kinnaman became more middle-of-the-road with the appearance of Commissioner Piggott? Do you think that's what caused her to appear middle-of-the-road? Yes. Thank you, counsel.